UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY


                                    )
FERNANDO V. MARULANDA-TRUJILLO, )
         Petitioner,                )    Case No.
                                    )
                                    )
         v.                         )    EMERGENCY PETITION
                                    )    HABEAS CORPUS PETITION
                                    )    UNDER 28 U.S.C. 2241
UNITED STATES OF AMERICA,           )    COMPASSIONATE RELEASE UNDER
         Respondent.                )    18 U.S.C § 3582(c)(1)(A)
                                    )


EMERGENCY PETITION FOR WRIT OF HABEAS
CORPUS UNDER 28 U.S.C. § 2241, AND FOR
APPOINTMENT OF COUNSEL UNDER 18 U.S.C. § 3600A(c)



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY


|  |  |
|---|---|
| FERNANDO V. MARULANDA-TRUJILLO, ) | |
| Petitioner, ) | Case No. |
| ) | |
| ) | |
| v. ) | EMERGENCY MOTION FOR RELIEF OF |
| ) | SENTENCE. IN THE ALTERNATIVE, |
| ) | HABEAS CORPUS 2241. |
| UNITED STATES OF AMERICA, ) | IN THE ALTERNATIVE, 18 U.S.C. |
| Respondent. ) | § 3582(c)(1)(A) |
| ) | |


MOTION FOR RELIEF OF SENTENCE.
IN THE ALTERNATIVE, HABEAS CORPUS 2241.
IN THE ALTERNATIVE 18 U.S.C. § 3582(c)(1)(A)


Comes now, Fernando V. Marulanda-Trujillo, hereon as Petitioner ((Petitioner)), in Forma Pro Se, hereby moves this Court for EMERGENCY RELIEF, pursuant to sentence reduction under habeas corpus 2241, or in the alternative, 18 U.S.C. § 3582(c)(1)(A). Specifically, Petitioner request that this Court consider that under the emergency state of COVID-19 pandemic that Petitioner is living out, that this Court promptly resentence him to time served and order his release from FCI Fort Dix, New Jersey.

- 1 -

## PROCEDURAL HISTORY

Petitioner was arrested January 12, 2012, after he traveled from Colombia, at his own expense and willfully self-surrendered to the authorities in the Southern District of Florida. He promptly pled guilty on February 27, 2012, to Count 1 of the indictment, which charged him with conspiracy to possess with intent to distribute 5 kilograms or more of cocaine, knowing it would be inported into the United States, in violation of 21 U.S.C. § 963. On or about July 30, 2012, Petitioner was sentenced to a 210 month sentence.

## INTRODUCTION

Petitioner respectfully submits this emergency motion for relief of sentence, or in the alternative, habeas corpus 2241, or in the alternative, 18 U.S.C. § 3582(c)(1)(A), for immediate release from FCI For Dix. He seeks this relief as modified by the First Step Act, and does so to protect the integrity of the Eighth Amendment and Due Process rights afforded by the United States Constitution. This prayer for relief is moreso in the interest of justice and common law interest. This "Emergency request for relief" is based on the likelihood, given his "CHRONIC UNDERLYING MEDICAL CONDITIONS," that exposure to severe acute respiratory syndrome, coronavirus (hereinafter "coronavirus"), and its resulting disease, COVID-19, will cause his "DEATH." Moreso is the current outbreak that Petitioner's designated institution, FCI Fort Dix, has been confronted with. (See Judicial Notice documents presented herein.)

- 2 -

As amended by the First Step Act, the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling reasons." COVID-19 is a serious respiratory disease that is highly contagious and potentially fatal. After a short period wherein the virus seemed to have receded somewhat, it has returned in full force in greater numbers infected. Petitioner is surviving his sentence at Fort Dix where as it is understood is the hot spot where the infection rate has skyrocketed. A few weeks ago, the Bureau of Prisons ("BOP") publicly reported no infected inmates at Fort Dix. There were 59 reported cases on October 29, 2020, and overnight the number of infected inmates nearly tripled. As of November 3, 2020, the reported number of infected inmates rose to 166, and the reported number of infected staff rose to 10.[1] The coronavirus outbreak at Fort Dix has become a grave concern for inmates, their families, and BOP officials.

The growing coronavirus pandemic, which public health experts and policymakers recognize as especially dangerous in the confines of correctional institutions, is an extraordinary and compelling circumstance. Moreover, Mr. Marulanda (Petitioner), has several chronic underlying medical conditions, including among others, extreme obesity and hypertension, which in conjunction with the several other medical conditions, put

1. https//www.bop.gov/coronavirus (last accessed 11/3/2020).

him at a severely greater risk of serious complications from COVID-19. This risk - which is greater within the confines of the close quarters in prison - combined with the totality of the circumstances of an unprecedented modern pandemic, warrants an immediate sentence modification of the conditions of his custodial sentence to allow him a sentence reduction to time served.

## CONSIDERATION FOR EMERGENCY RELIEF

It begs to serve notice that as of September, 2020, the BOP has elected to house inmates that have been transferred from FCI Elkton, Ohio to FCI Fort Dix.

FCI Elkton has been regarded as one of the epicenters of Federal Institutions with cases of coronavirus, including casualties of death because of the COVID-19 virus itself. With public information giving to understand that FCI Elkton has, and is suffering, from a 90% rate of positive COVID-19 infections. Confidence in the managing of the pandemic by the Bureau of Prisons is at an all time low.

Prior to the arrival of the FCI Elkton inmates, the adjacent Fort Dix Camp to the institution suffered an outbreak where over 58 inmates and a number of staff had been infected. Nevertheless, in the surrounding area of FCI Fort Dix in September 2020, the BOP website had reported 5 inmates and 1 staff member. This number rose to 58 inmates, and soon after to a purported 108 inmates. As of October 2020, the BOP reported a

- 4 -

Petitioner reports that there is no hand sanitizer available to the inmates and air circulation is very poor. He is currently being housed in a 12-man cell with no personal protection equipment and using communal bathrooms shared with over 350 inmates. The New York Times recently explained why jails are a much more dangerous place to be than even a cruise ship. See "An Epicenter of the Pandemic Will be Jails and Prisons, If Inaction Continues," The New York Times (March 16, 2020), available at www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.

Fort Dix prison is the largest prison in the FBOP and has the largest inmate population. All of the housing units, and several other buildings at Fort Dix are at minimum 75 years old, some with rook leaks, all having mold covering and asbestos throughout the buildings from bathrooms, showers, hallways, ceilings, and floor tiles, etc. This, coupled with an inadequate ventilation system and overcrowding can lead to more COVID-19 related deaths than any other prison.

The CDC's mandate of social distancing of 6 feet is impossible to adhere to at Fort Dix, due to severe overcrowding. Each building is housing more than 350 inmates per unit, 12 inmates per cell. Given the substantial number of inmates housed "in one unit" by cramming 12 inmates per cell creates a cataclysmic environment for a deadly outbreak of COVID-19. A petri dish so to say for the spread of COVID-19. Recently, in a Class action lawsuit filed by the ACLU seeking relief for inmates at Fort Dix, Warden David Ortiz is quoted as saying

- 6 -

number of 228 infected inmates and 18 staff members. The popular opinion is that over 300 inmates are infected at the time of this writing. Fort Dix is at this time the "number one" federal institution with COVID-19 cases in the nation.

To have transferred these inmates from FCI Elkton to FCI Fort Dix was a capricious move decided by the BOP. Families, inmates and even staff members are more than concerned, they are "scared."

Given the COVID-19 global pandemic that is killing citizens with pre-existing medical conditions like Petitioner disproportionately, he faces a serious risk of dying in prison if he should become infected. See "Severe Outcomes Among Patients with Coronvirus Disease 2019 (COVID-19) - United Sttes, February 12 - March 16, 2020," Centers for Disease Control and Prevention report (March 18, 2020), available at www.cdc.gov/mmwr/volumes/69/we/mm6912e2.htm.

The spread of the virus has been particularly acute within the prison population. This unparalleled health crisis in our country and in our prisons presents "extraordinary and compelling reasons" to grant this motion. According to public reports, FCI Fort Dix already has multiple inmates and staff infected with the deadly disease. The facility is also overcrowded - beyond recommended or even lawful capacity - and the conditions there make it impossible for Petitioner to take measures to protect himself in order to avoid becoming infected. "Social Distancing" is not an option for most inmates.

- 5 -

Petitioner reports that there is no hand sanitizer available to the inmates and air circulation is very poor. He is currently being housed in a 12-man cell with no personal protection equipment and using communal bathrooms shared with over 350 inmates. The New York Times recently explained why jails are a much more dangerous place to be than even a cruise ship. See "An Epicenter of the Pandemic Will be Jails and Prisons, If Inaction Continues," The New York Times (March 16, 2020), available at www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.

Fort Dix prison is the largest prison in the FBOP and has the largest inmate population. All of the housing units, and several other buildings at Fort Dix are at minimum 75 years old, some with rook leaks, all having mold covering and asbestos throughout the buildings from bathrooms, showers, hallways, ceilings, and floor tiles, etc. This, coupled with an inadequate ventilation system and overcrowding can lead to more COVID-19 related deaths than any other prison.

The CDC's mandate of social distancing of 6 feet is impossible to adhere to at Fort Dix, due to severe overcrowding. Each building is housing more than 350 inmates per unit, 12 inmates per cell. Given the substantial number of inmates housed "in one unit" by cramming 12 inmates per cell creates a cataclysmic environment for a deadly outbreak of COVID-19. A petri dish so to say for the spread of COVID-19. Recently, in a Class action lawsuit filed by the ACLU seeking relief for inmates at Fort Dix, Warden David Ortiz is quoted as saying

- 6 -

"Social distancing is not possible in this environment."

Individuals "are at special risk of infection, given their living situations" and "may also be less able to participate in proactive measures to keep themselves safe." Indeed, the tactics the CDC recommends to prevent the spread of the disease, including frequent hand washing, the use of alcohol based hand sanitizers, social distancing, wearing face masks, and other protective gear, and frequent disinfecting of living spaces - are difficult - if not impossible for inmate incarcerated at Fort Dix.

The number of confirmed BOP COVID-19 cases has reached 10,000 inmates, outpacing the increase rate for the United States generally. The risks to Petitioner are real at Fort Dix, where the BOP has confirmed that at least 230 inmates and over 20 staff members had contracted the virus. Experts have warned that COVID-19 can spread rapidly among prison populations given these conditions, coupled with the increased chance that staff at the facility will carry the virus back to their communities or - vice versa - contaminate the facility as guards are being relegated throughout the prison."

## EXHAUSTION REQUIREMENT IS NOT JURISDICTIONAL

"Exhaustion requirement can either be (1) jurisdictional, meaning the rule governs a court's adjudicatory capacity, that is, its subject matter or personal jurisdiction, or (2) a claims-processing rule, which are rules 'requiring that a party

- 7 -

take certain procedural steps at certain specified times,'" when looking at the text of 18 U.S.C. § 3582, the language "does not clearly state" that the exhaustion requirement is jurisdictional. The provision does not speak in jurisdictional terms or refer in any way to the jurisdiction of the courts. Because of this, the language of 3582(c)(1)(A) does not provide a clear indication that Congress intended the provision to be jurisdictional. Applying the Rule of Lenity, 18 U.S.C. § 3582(c)(1)(A) should be interpreted in Petitioner's favor that the exhaustion requirement is not jurisdictional and this Court has the authority to hear Petitioner's motion without requiring him to exhaust his administrative remedies.

Petitioner also avers the exhaustion requirement is not mandatory, but one of two ways a person could get into court. In 3582(c)(1)(A) - amended by the First Step Act - a person can either engage their administrative remedies or they can "wait 30 days after the Warden receives the Petitioner's request to bring a motion for a sentence reduction." Also note, there are equitable exceptions as well. Because 3582(c)(1)(A) has "two avenues of relief," and administrative exhaustions requirement and a timeliness statute, the equitable ... exceptions plainly apply to the latter." In the wake of the COVID-19 pandemic, other courts have applied the 'equitable tolling' standard given 3582(c)(1)(A) has the feature of a timeliness statute. Thus, Petitioner meets the equitable tolling standard listed above as each day that passes brings him close to exposure and possibly

.

- 8 -

death

Mr. Marulanda has fully exhausted his administrative remedies to where he has submitted the required BP-9, BP-10, and BP-11. Inasmuch in a meeting with Unit Manager Delaney, she informed Petitioner that he was now considered by the Administration to foresee submitting a compassionate release petition directly to the Courts. Ms. Delaney then handed Petitioner a copy of a compassionate release form so that he may move forward to the courts.

Even so, Petitioner has not received a reply from the submitted BP-11, which was submitted months earlier. Petitioner has fulfilled all of the requirements necessary. His medical conditions are well established. He is 69 years of age, has served over 50% of his sentence, is not a danger to the public and or society.

## MEDICAL HISTORY AND CONDITIONS

It serves to make note that on or about the second week of November 2020, Petitioner was taken to the local civilian hospital for emergency care. After experiencing chest pains, numbness in his left arm, and trouble breathing, a battery of tests were performed. It has been diagnosed that Mr. Marulanda is in dire need of surgery to repair two arteries that are clogged. One artery is 100% clogged, and the other is 60% clogged. Also, there must be performed a surgical procedure regarding Petitioner's gall bladder, because of accumulated

- 9 -

fluid in his bladder. (This interpretation is layman in essence, being that it has proven very difficult to attain recent medical records at the time of this writing due to the lockdown status the institution is under).

Petitioner has a history of chronic atrial fibrillation, severe mitral valve regurgitation, multivessel coronary artery disease, chronic diastolic heart failure, iron deficiency, anemia, hypertension and hyperlipidemia.

On or about March of 2018, Petitioner experienced a heart attack upon being taken to the emergency room in the institution. Petitioner required resuscitation and a heart restart with electric current. Upon being taken to the local civilian hospital, Petitioner underwent open heart surgery and a dual chamber (carries electrical pulses to the right ventricle and the right atrium of the heart to help control the timing of contractions between the two chambers) permanent pacemaker/defibillator was inserted in March 2018.

On or about April 2018, Petitioner had a mitral valve replacement. He also underwent a cardiac catherization. While Petitioner needed to undergo an artery bypass graft surgery at this time, the BOP medical staff determined that he had available alternative circulation around the blocked artery via nearby minor vessels. In reality, this decision in itself has now placed Mr. Marulanda in a very precarious oosition of life and death. ("It is for this very reason that Petitioner was taken to emergency care recently").

As if not enough at the time, Petitioner developed a seroma at the incision site of his right groin. "A seroma is a collection of fluid that builds up under the surface of the skin, most often after a surgical procedure." On July 30, 2018, he underwent an evacuation of the seroma, after which he was hospitalized for a month while the surgical wound healed. (Let us make note of a matter of prison procedure: Imagine being shackled and one had cuffed to a medical bed, for an extended period of time, for a month, while your body heals from a surgical prcedure.) On or about June 2019, once again Petitioner was hospitalized for another severe days for heart related issues.

Comes to matter at this point is the reality of Petitioner's dire health conditions, especially in a time of pandemic as we are living out. Petitioner's extreme obesity is very concerning because it very much so further complicates matters for the Petitioner. It is understood that for people who are overweight-obese, the virus is particularly damaging. Being overweight-obese, the factor becomes that upon the immune system being severely attacked, the patient's arteries are contracted, squeezed-compressed, where the air flow is cut off. We do not have to imagine what would of a patient as Petitioner, it would instantly kill him. Because the flow of oxygen is conducted by way of the bloodstream to the lungs, Petitioner's are already blocked.

- 11 -

## CONSIDERING 3553(a) FACTORS, THE COURT SHOULD
## GRANT PETITIONER COMPASSIONATE RELEASE

On its merits, in light of the requirements of Section 3582(c)(1)(A) and Section 3553(a) factors, Petitioner is a strong applicant for Compassionate Release, and his sentence of imprisonment should be reduced to time served.

First, as described above, Petitioner is a non-violent offender. He is not a danger to the safety of any other person or to the community and has strong support. Second, as also discussed above, because of this medical condition he faces a heightened risk of contracting COVID-19 and suffering life threatening consequences and complications if he does contract this disease.

Sadly, the procedures and recommendations of the CDC for protecting against this novel virus is wholly impractical due to FCI Fort Dix's structural designs of close housing without the required social distancing guidelines, as well as prohibitions against providing inmates with the most effective hand sanitizers, which should contain alcohol, according to the CDC. This leaves Petitioner in a time-locked tinderbox, sure to implode with devastatingly catastrophic proportions. Petitioner's present housing is in a double-bunked bed, making CDC's mitigation protocols impossible to follow. It is equally important to note that the sanitizing protocol of the CDC to use alcohol based hand sanitizer is not available. Thus, the basic and most effective mitigation measures scientifically and

- 12 -

medically proved to prevent the spread of COVID-19 is unavailable at BOP facilities, including Fort Dix.

There are many similarly situated inmates who suffer from the same health conditions as Petitioner. Inmates with lesser concerning medical conditions have petitioned the Court for Compassionate Release due to the COVID-19 pandemic have been granted. The following inmates are a few of many inmates who were resentenced to time served due to one of the health conditions Petitioner presenlty suffers from. See <u>United States v. Rivernider</u>, 2020 US Dist. LEXIS 83295, May 12, 2020, Dist. of Connecticut - The Court found that the risk posed to Mr. Rivernider's health by the novel COVID-19 constituted an extraordinary and compelling reason justifying compassionate release in accordance with § 3582(c)(1)(A), as Mr. Rivernider suffers from diabetes, heart disease, and hypertension. Also see <u>United States v. Scparta</u>, 2020 US Dist. LEXIS 68935 (2md Cir.) Mr. Scparta suffered from high blood pressure, high cholesterol, sleep apnea, and hypertension. Due to COVID-19 and his health conditions, the Court granted Mr. Scparta's motions for Compassionate Release.

Federal Law provides that a court can reduce a term of imprisonment in certain cases. This is found in Title 18 of the United States Code, Section 3582(c)(1), commonly known as the "compassionate release" statute. Prior to December 2018, the court could only grant a compassionate release upon motion of the Director of the Bureau of Prisons. This gave the Bureau of

Prisons the sole discretion over whether to grant to an inmate.
"[A]ccording to new federal data analyzed by The Marshall
Project and the New York Times[, f]rom 2013 to 2017, the BOP
approved 6 percent of the 5,400 applications received, while 266
inmates who requested compassionate release died in custody. The
bureau's denials, a review of dozens of cases shows, often
override the opinions of those closest to the prisoners, like
their doctors and wardens (SOURCE: www.nytimes.com/2018/07/07/
us/prisons-compassionate release.htm)

In December 2018, President Trump signed the First Step Act
into law. The First Step Act gave inmates the right to petition
the courts directly for compassionate release. As a result, the
compassionate release statute currently reads:

> (A) The court, upon motion of the Director of the
> Bureau of Prisons, or upon motion of the defendant
> after the defendant has fully exhausted all
> administrative rights to appeal a failure of the
> Bureau of Prisons to bring a motion on the
> defendant's behalf or the lapse of 30 days from the
> receipt of such a request by the warden of the
> defendant's facility, whichever is earlier, may
> reduce the term of imprisonment (and may impose a
> term of probation or supervised release with or
> without conditions that does not exceed the unserved
> portion of the original term of imprisonment), after
> considering the factors set forth in section 3553(a)
> to the extent that they are applicable, if it finds
> that (i) extraordinary and compelling reasons warrant
> such a reduction and that such a reduction is
> consistent with applicable policy statements issued
> by the Sentencing Commission.

Subsection (a)(1) reads that "(i) extraordinary and
compelling reasons warrant such a reduction;" That subsection,
however, is not further defined or explained. And as will be

- 14 -

explained in the cases below, the applicable sentencing commission guideline, USSG § 1B1.13, has not been updated to provide further guidance. This means that in certain districts, inmates may be able to receive relief by directly petitioning the court under § 3582(c)(1)(A). A review of several 2019 cases gives important information about how to do this.

MEDICAL REASONS: United States v. Cantu

In United States v. Cantu, No. 1:05-cr-458-1, 2019 WL 2498923 (S.D. Tex. June 17, 2019), Cantu pled guilty to one count of Racketeering and was originally sentenced to 290 months in prison. He sought release under 18 USC § 3582, asking for a reduction in sentence to time served to indicate that 30 days had elapsed from his reduction in sentence request to the warden and a response. The court examined USSG 1B1.13 to determine what the Sentencing Commission considers "extraordinary and compelling." While Cantu had not presented evidence about why his reasons were extraordinary and compelling, the court determined that they had the power to make that determination. This was in part because the First Step Act's enactment meant that the policy statement 1B1.13 was no longer applicable to the statute and meant that the policy statement did not provide guidance on the appropriate use of sentence-modification provisions under 3582. The Court also relied on the Rule of Lenity, which in this situation mandates that "when two rational readings of a statute are possible, the one that treats the

- 15 -

defendant less harshly prevails," citing NcNally v. United States, 483 U.S. 350, 359-60 (1987).

The court also determined that the statute did not define or place any limits of what "extraordinary and compelling reasons" might warrant such a reduction, citing Crowe v. United States, 403 App'x 484, 485 (6th Cir. 2011). Having determined that they had the authority to grant relief, the court determined that there were extraordinary and compelling reasons present in Mr. Cantu's case that warranted a reduction in sentence under 3582(c)(1)(A). This included the government's statement that the court could issue an order that would cause the BOP to release the defendant (Cantu had also sought release under the Elderly Offender Home Detention Program in the same motion. The government agreed that he was eligible and asked the court to grant and order, "causing the BOP to release Mr. Cantu under that program," but the court determined that they did not have the authority to grant such relief). The court went on to determine the Mr. Cantu was not a danger to the safety of others and that the 3553 factors supported Mr. Cantu's request for compassionate release. The court granted that release and amended his sentence to time served.

United States v. Beck

In United States v. Beck, 1:13-cr-186-6 (M.D. N.C. June 28, 2019), Beck sought immediate release under the First Step Act of 2019, stating that "indifference to her treatment constitute[d]

- 16 -

extraordinary and compelling reasons." Beck claimed that lumps in her body were not properly addressed and that her treatment schedule was inappropriate, leading to metastatic breast cancer that had progressed to a point where it was too late to do either radiation or chemotherapy.

The court noted that there is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act. The court noted that the Sentencing Commission has not amended or updated the old policy statement since the First Step Act was enacted and that it was unlikely that they would soon given that he Sentencing Commission does not have sufficient members to vote to amend the guidelines. The court determined that "courts may, on motions by the defendants consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement."

The court determined that the improper treatment schedule constituted extraordinary and compelling reasons under 18 U.S.C. § 3582, that the reduction is consistent with the Sentencing Commission's Guidance, that Beck was not a danger to the community and that the 3553 factors warranted a reduction. The court reduced Beck's sentenced to time served.

- 17 -

EXTREME AND COMPELLING AS APPLIED TO OLD LAW 924(c): United States v. Urkevich

In United States v. Urkevich, 8:03-CR-37, 2019 WL 6037391, District of Nebraska, Nov. 14, 2019, the defendant was sentenced on May 10, 2004 to "235 months on Count I (this was a drug conspiracy count), 60 months on Count II (this was a 924(c) count), 300 months on Count III (this was a 924(c) count), and 300 months on Count V (this was a 924(c) count), plus concurrent terms of five years of supervised release on each count." This was prior to the enactment of the First Step Act. As previously discussed, "[t]he First Step Act, among many others things, amended 18 U.S.C. § 924. In Section 403 of the Act, Congress amended § 924(c)(1)(C) so a consecutive term of 25 years (300 months) for a second or subsequent conviction for possession of a firearm during a drug trafficking crime is no longer mandated if the crime was committed before a prior conviction under the subsection was final. This amendment would have benefited Urkevich if it had been in effect at the time of his sentencing," but the court determined that Section 403 of the First Step Act could not be applied retroactively.

The court also noted that "the First Step Act also amended 18 U.S.C. § 3582" in the manner previously discussed in this article. Urkevich asked the court to reduce his sentence to 368 months or what he would have received if he was sentenced to the same offense today and received 60 months for each 924(c) count. Urkevich submitted his evidence that he sought administrative

- 18 -

remedies. The court granted the government the ability to respond. The government opposed all relief stating that Urkevich had not demonstrated "extraordinary and compelling reasons" for the reduction although he has demostrated post-offense rehabilitation and that he does not pose a current danger to the safety of any other person of the community. The government also indicated that even if Urkevich's sentence was reduced to 368 months, that would not qualify him for release from custody.

The court noted that "The Commentary describes certain circumstances under which "extraordinary and compelling reasons" for a reduction in sentence are deemed to exist, but the Commentary does not suggest the list is exclusive. Application Note 1(D), titled "Other Reasons" is a catch-all provision, noting that the Director may determine "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." The court also stated that other courts have concluded that the Commission's failure to amend USSG 1B1.13 does not preclude a court from acting on motions using the application note 1(D) "catch-all provision." The court used this reasoning to determine that the court's contemplation of a reduction in Urkevich's sentences is consistent with the Commission's policy statements.

The court determined that this motion was not premature and that a reduction in this sentence was warranted by extraordinary and compelling reasons, "specifically the injustice of facing a

- 19 -

term of incarceration forty years longer than Congress now deems warranted for the crimes committed." The court also concluded that Urkevich demonstrated that he poses no current danger to the safety of any other person or the community. The court reduced his sentence to Counts III and V to 60 months to run concurrently.

The First Step Act's changes to 3582 potentially open the door for wide latitude for courts to reduce sentences if the court finds that they have the ability to determine if "extraordinary and compelling circumstances" exist to do so. As shown here, this can apply in what could be considered a "normal compassionate release" situation, but there are other situations where it could also apply.

### PETITIONER'S MEDICAL CONDITION IS AN EXTRAORDINARY AND COMPELLING REASON TO REDUCE HIS SENTENCE

Separate from the Court's independent authority to determine what circumstances are extraordinary and compelling. Petitioner qualifies for compassionate release pursuant to 1B1.13 based on his medical condition. In pertinent part, the application note to 1B1.13 states that "extraordinary and compelling reasons" exist when a petitioner is:

suffering from a serious physical or medical conditoin.
...
that subsequently diminishes the ability of the defendant (Petitioner) to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
U.S.S.G. § 1B1.13 app. 1(A)(ii)[2]

---

2. Notably this provision does not require a determination to be made by the Director of the BOP.

A defendant who suffers from a t least one underlying condition that increases susceptibility to COVID-19 suffers from a serious physical or medical condition and cannot practice self-care in a correctional facility. See, e.g., United States v. King, No. 17-cr-20332, 2020 WL 5440324, at *4-5 (E.D. Mich. Sept. 10, 2010) (finding that a defendant with obesity, asthma, or hypertension could not practice self-care while in custody, creating an extraordinary and compelling reason warranting compassionate release).

(2) Self-Care

Self-care in the era of COVID-19 includes the following CDC recommended measures to reduce the risk of contracting the coronavirus. Id. See also, United States v. Massibgille, No. 16-cr-20193 WL 4569582, at *6 (E.D. Mich. Aug. 7 ,2020).

The CDC recommends that people - particularly those with underlying conditions - protect themselves by limiting their "interactions" with other people as much as possible. See Centers for Disease Control and Preventions, "People With Certain Medical Conditions" (last updated Oct. 6, 2020) https://bit.LV.zgomMXN [hereinafter "CDC Underlying Conditions Advisory"] The CDC further recommends people take various precautions when interacting with others, such as avoiding close contact, frequent handwashing and frequently cleaning and disinfecting high-tough surfaces, Centers for Disease Control and Prevention "How To Protect Yourself and Others."

Because of the shared facilities in prisons, ("particularly

FCI Fort Dix"), difficulty of social distancing and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high. United States v. Fletcher, No. 05-cr-179, 2020 WL 397212, at *2 (D. Md. July 13, 2020). See also, United States v. Hooker, No. 18-cr-768, 2020 WL 4463156, at *3 (S.D.N.Y. Aug. 3, 2020) that is particularly dangerous to certain people with underlying conditions, like petitioner, that make them particularly susceptible to severe case of COVID-19. As a result, Petitioner as a person within a BOP (specifically FCI Fort Dix), correctional facility cannot follow the CDC recommended guidelines, as a result, he is unable to provide self-care within the environment of a correctional facility.

> Petitioner's chronic obesity and physical conditions are a serious medical concern from which he is not expected to recover.

Note 1(a)(ii) United States v. Turner, No. 13-cr-08, 2020 WL 5569532, at *3 (Md. Sept. 17, 2020). The CDC has identified various underlying conditions that increase a person's risk of severe illness from COVID-19. Petitioner's BMI is over 40, which is a severe rating in the "Red". In layman's terms: One of the effects of being obese is the factor of suffering from ("Syndrome X," clogged arteries). When the flow of oxygen to the heart is interrupted because the arteries that inject oxygen to the heart are clogged, the heart itself is compromised, leading to a number of other complications.

## PRAYER FOR RELIEF

For the foregoing reasons, Petitioner moves this Honorable Court to grant relief by way of "Compassionate Release."

According to the Merriam-Webster's Collegiate Dictionary, 11th Ed.; the meaning of compassion is: "Sympathetic consciousness of others with a desire to alleviate it; pitty." "Granted because of unusual distressing circumstances affecting an individual."

As stated herein substantially, Mr. Marulanda's (Petitioner) physical health is deteriorating with every day being lived out. The very fact that he is presently suffering from, among other things, two clogged arteries and is urgently in need of artery bypass graft surgery, are no simple matters. These arteries, in particular, are the conduits of oxygen and blood flow to the heart in ways that the heart now distributes blood flow and oxygen to the lungs, an avenue all the way to the feet (of course this is a layman's interpretation being described). Nevertheless, the institution's medical records can attest to everything being mentioned here.

Petitioner, under the scrutiny of the ongoing COVID-19 pandemic, will not survive if not properly taken care of professionally and or otherwise. Of Course, the Government, in its found argument or "wait and see" approach (See United States v. Cuevas, 2020 U.S. Dist. LEXIS 137562 (D. Md. Aug. 3, 2020)), is beyond realizing the moment in time we are living. Not to get into the matter of litigation or arguing the law, and or

- 23 -

circumstances of the conviction itself of the charges Petitioner was found guilty of. But let's take into account that the Government does not have an argument against the reality of Petitioner's dire health conditions. All in all what the matter at hand it, is a compassionate release motion that is being addressed to this Court. It is clearly understood that the administration of the institution's medical department, and even the Warden, Mr. David Ortiz, are in the understanding that Petitioner should be afforded compassionate release. Even the Medical Director of Fort Dix's medical department, Dr. Tucker Foster, has stated that she has done everything within her means to see to a consideration of compassionate release for Mr. Marulanda, (Petitioner). Many can attest to these conversations with the medical department heads of Fort Dix. Today, Fort Dix is in dire straits trying to handle an outbreak that has gotten out of hand, with now hundreds of inmates testing positive for COVID-19.

Your Honor, must Petitioner die in prison to serve out right his sentence? It is in the Court's granted powers to see compassionate release to this Petitioner. So be it in God's name.

### FINAL NOTE

Mr. Marulanda (Petitioner) is now 69 years old. He speaks Spanish only, and has used a fellow prisoner to communicate in English. He has no criminal history; he has no history of

- 24 -

violence and the Eleventh Circuit has dismissed his appeal.
Petitioner has maintained clear conduct while incarcerated. With
his good time credits, Petitioner has satisfactorily served
almost half his sentence.

Two of the §3553(a) factors have changed and carry
considerable more weight now than at sentencing. They are,
"...the history and characteristics of the defendant," 18 U.S.C.
§ 3553(a)(1) and (2) the need for the sentence imposed...to
provide the defendant with...medical care...in the most effective
manner," 18 U.S.C. § 3553(a)(D).

It is the policy of the BOP to provide care that its
clinicians determine to be medically necessary. Medically
appropriate but not always "necessary" are considered elective
and must undergo review by a utilization review committee before
approval, and are unlikely to be approved and completed based on
limited medical resources.

Petitioner should be under the care and treatment of a
cardiologist and an electrophysiologist of his choosing. An
electrophysiologist is an arrhythmia specialist, a doctor with
specialization in abnormal heart rhythms. He should be seen as
directed by his doctors, not at the discretion of the BOP to be
taken from his institution to a doctor or hospital when
emergencies arise. His pacemaker requires regular monitoring;
both the battery life and its programming, as does his medical
prescriptions. Petitioner's overall physical and mental health
also requires monitoring, both of which are essential to his

satisfactory adjustment to, and life with, his pacemaker and heart conditions.

A reduction in sentence would guarantee Petitioner optimal medical treatment by doctors that he deems most appropriate and "in the most effective manner," Further, it would give Petitioner ongoing support from family and friends in his community in Colombia; support he is completely without in a foreign country and behind prison walls in New Jersey. The requested reduction in sentence would not disserve the other factors set out in 18 U. S. C. 3553(a)(2)(A). Finally, the Sentencing Commission advises that age and illness may be reasons for departing or varying below the guideline range recommended by the sentencing guidelines. See § 5H1.1, 5H1.4. Notably, sick and elderly prisoners have the lowest recidivism rates, yet are the most expensive people to incarcerate. Neither taxpayers, families, nor public safety benefit from keeping sick and elderly prisoners behind bars.

Petitioner understands and agrees that the offense he committed was serious. At the same time, he respectfully asserts the purposes of sentencing would be adequately served by a reduction in sentence given his current age and serious medical condition. Regardless of what the BOP can, or will, do to help him, the most effective manner of treatment for Petitioner is for him to seek treatment with doctors of his choosing at a facility in his community, near his support network of family and friends.

## RELEASE PLAN

Upon release from incarceration, Petitioner will be deported to his native Colombia where he will reside, never to return to the United States. He will not pose any danger to the public and will not recidivate. He has a special condition of Supervised Release that requires him to be surrendered to the custody of the U.S. Immigration and Customs Enforcement for removal proceedings consistent with the Immigration and Nationality Act. If removed, he shall not reenter the United States without prior written permission of the Undersecretary for Border and Transportation Security. The term of supervised release shall be non-reporting while he is residing outside the United States. If he reenters the United States within the term of supervised release, he is to report to the nearest U.S. Probation Office within 72 hours of his arrival.

The First Step Act has given this Court the ability to make this happen. Mr. Marulanda (Petitioner) respectfully requests that this Court enter a Compassionate Release order releasing him from incarceration pursuant to 18 U.S.C. § 3582(c)(1)(A). In this regard, Petitioner respectfully asks this Honorable Court to reduce the sentence of imprisonment to time served. Upon release, he would be deported to Colombia where he will serve a 5-year term of no-reporting supervised release, as he will be residing outside the United States, never to return to the United States. This will allow him to end his days surrounded by his family and loved ones.

## ULTIMATE FINAL NOTE
(In Support of Motion Being Filed)

It is respectfully addressed to this honorable Court that at the time of the writing of the presented Emergency Petition, Petitioner Fernando V. Marulanda fell ill once again and was subsequently taken to the emergency room of an outside hospital. This is, in fact, the third time in two (2) months that Mr. Marulanda has been rushed to the civilian hospital for emergency care.

It is to be understood that under the present circumstances, Mr. Marulanda is proceeding in forma pro se, and it is the be noted that according to the Bureau of Prisons' Program Policy, "An inmate may assist another inmate in what legal matter may be seen to be addressed." Mr. Marulanda does not speak English. After exhausting his financial means, and that of his family members, he is now without further recourse to retain representation of a private attorney.

In as much, I herein respectfully present myself as the person "Inmate," Osvaldo Rosa (Reg. No. 16772-054), as the inmate-person who has been, and is assisting Mr. Marulanda. I also assisted Mr. Marulanda in filing his administrative remedies (BP-9, BP-10 & BP-11). I have served as Mr. Marulanda's interpreter on several occasions throughout the years. This can

- 28 -

be attested by Unit Manager Ms. Delaney, Hospital Administrator Mr. Hacksenki, and also Dr. Ragone, the psych specialist here at FCI Fort Dix. Also, by Mr. Marulanda's previous attorney, Oscar Rodriguez.

What is being stated herein and hereon are accounts that were witnessed by my person, and I present these accounts in writing and do so under penalty of perjury.

During the courses of the past years, Mr. Marulanda has coursed all of the vehicles under administrative remedy that are required, (BP-9, BP-10 & BP-11). In as much there has been no reply of the last presented BP-11 submitted on or about June, 2020. Subsequently, on or about October, 2020 in a meeting with Unit Manager Ms. Delaney, she presented a copy of a generic form - petition 3582 - to move on with a petition for Compassionate Release. Ms. Delaney, at the time, expressed that Mr. Marulanda should be considered for relief under the compassionate release statute because of his medical conditions. I must add that this opinion was also shared by Hospital Administrator Dr. Tucker-Foster, and also H.S.A. Mr. Hacksenki, when speaking to my person.

It is to apprise this Court that Mr. Marulanda had previously filed two (2) motions to the District Court of Miami. While the circumstances of today are as more dire than ever before, it was the District Court's disposition to deny relief to Mr. Marulanda. It could be determined that the Government's reply in opposition did not make a forthcoming argument based on the relief sought by way of Compassionate Release motion "3582" presented. Instead,

- 29 -

what the Government emphasized was based on outdated information regarding the old criteria established for Compassionate Release – Relief, and the outdated criteria under 1B1.13. Moreover, the Government sought the position to re-litigate factors of Mr. Marulanda's PSI information, and turning the eyes to preponderance of evidence information that Mr. Marulanda never pled guilty to. In as much, the true nature of the relief sought was never fully regarded.

As of today, Mr. Marulanda remains in the hospital suffering from post-Covid adverse effects, and other ailment.s

It serves purpose to explain how Mr. Marulanda contracted the COVID-19 infection; upon being released from emergency care from the local civil hospital, Mr. Marulanda tested "negative for the COVID-19 virus." This was specifically explained to him by the physicians attending to him at the local hospital the very day of his release after the emergency care visit. Upon arriving at the East compound facility where he is designated at Fort Dix, Mr. Marulanda was placed in the institutions quarantine isolation ward. One week later, the administration sough to place another inmate in the isolation cell along with Mr. Marulanda. Mr. Marulanda with all due right was livid over these actions by the administration because he would now have to restart the 14-day clock of quarantine period. In as much, he called out to request a meeting with Dr. Ragone, the psychology specialist and my person as translator. Mr. Marulanda requested answers as to why the administration was acting in such disregard. Dr. Ragone stated that he would see into the matter and speak to hospital

assistant administrator Ms. Donely. What transpired later was actually adding insult to injury. Days later they placed yet another inmate in the quarantine cell who had self-surrendered in the moment from the civilian world to begin serving his sentence. Soon after, Mr. Marulanda contracted the COVID-19 virus and was yet taken once again to the emergency room at the local civilian hospital. Upon arriving after some days, Mr. Marulanda was placed in the quarantine unit 5703 with other positive inmates. As we were ready to file said motion herein, on or about December 28 Mr. Marulanda was rushed to the emergency room once again.

As it is understood, Mr. Marulanda was in dire straits, medically speaking. He was defecating on himself, urinating on himself without control or awareness. He also was not remembering to take his more than a dozen prescribed medications. Once again, Mr. Marulanda was taken to the outside emergency room.

As of this writing, Mr. Marulanda remains hospitalized and neither his family or friends have been able to know of his whereabouts or medical status. My fiance is his niece and NO ONE of his family has been able to find out his status. This in itself is mental cruelty, not only for Mr. Marulanda, but also for his wife, Mrs. Nancy Marulanda Grisales, their children Camila, Sebastian, Isabella, his ten brothers and sisters, and the family at large.

I, Osvaldo Rosa, inmate #16772-054, hereby state under penalty of perjury, that all herein stated is true and correct to the best of my knowledge. And I do so say under penalty of perjury.

In Good Faith
In Support of the
Motion herein filed.

Osvaldo Rosa
Reg. No. 16772-054

## CONCLUSION

WHEREFORE, for the reasons herein, Petitioner respectfully request this motion for Compassionate Release be granted and this Honorable Court consider a reduction of sentence in order to alternatively be permitted to serve the remainder of his sentence on home confinement.

Sincerely yours,

Dated: December 26, 2020          Fernando V. Maurlanda-Trujillo

- 33 -

## CERTIFICATE OF SERVICE

I, Fernando V. Marulanda, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that on this $\underline{26}$ day of January, 2021, I placed a true and accurate copy of the foregoing "MOTION FOR RELIEF OF SENTENCE" in the institutional mailbox to the following party:

AUSA
U.S. Attorney's Office
District of New Jersey
50 Walnut Street
Newark, NJ 07102

Sincerely,

Fernando Vincente Marulanda Trujillo